# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | |
|---|---|
| UNITED STATES and STATE OF TEXAS *ex rel.* DANIEL W. ELLIOTT, M.D. and LISA A. MINSLOFF, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> SOUTHEAST TEXAS MEDICAL ASSOCIATES, LLP, *et al.*, <br><br> Defendants. | NO. 1:23-CV-00329-MJT |

## REPLY IN SUPPORT OF DEFENDANT
## BAPTIST'S MOTION TO DISMISS

In moving to dismiss Relators' Complaint pursuant to Rules 9(b) and 12, Defendant Baptist Hospitals ("Baptist") identified multiple fatal flaws in Relators' Complaint, foremost among them, the failure to allege: (i) a scheme to submit false claims for payment to the government, or (ii) that Baptist acted with the requisite scienter, that is "guilty knowledge" and "a purpose . . . to cheat the Government." *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (citations omitted). In particular, Baptist highlighted the Complaint's failure to allege – certainly with the specificity required by Rule 9(b) – *how* or *why* the Recruitment Agreements Relators voluntarily signed in 2015 and freely accepted the benefits of for many months suddenly became "shams" only when Relators decided to breach them, or how those Recruitment Agreements resulted in "unlawful referrals" despite the total absence in the Complaint of allegations of any actual referrals made as a result of the Agreements or even any *discussions* of referrals with anyone at Baptist.

In their response (ECF No. 157, the "Response" or "Resp."), Relators cure none of those defects. Instead, Relators rely almost entirely on the sort of conclusory assertions and labels that are plainly insufficient to state plausible claims to relief. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). For example, while Relators refer to the Agreements as "shams" no fewer than *31 times* in their Response, they do not point to *factual allegations* that would support that label. Similarly, while Relators refer to SETMA as a "major referral source" to Baptist 8 times in their Response, they again fail to point to any factual allegations in the Complaint that referrals were made or even contemplated as a result of the Agreements or part of the asserted "payment-for-referrals" scheme. Far from "unwarranted," (Resp. at 1) thus, Baptist's motion to dismiss is abundantly grounded on clear Supreme Court and Fifth Circuit precedent, precedent that makes clear that Relators' claims are meritless and must be dismissed. Relators' efforts to "drive up litigation costs" (*id.*) by repackaging a contractual dispute they previously litigated *and lost* into

1

an FCA action – one that neither the U.S. Government nor the State of Texas has deemed worthy of joining – should be rejected and the Complaint dismissed.

### I.     The Complaint Fails to Allege the Existence of an Unlawful Scheme

As argued more fully in Baptist's opening brief, Relators' claims fail because the Complaint wholly fails to allege the existence of a scheme to submit false claims or the submission of unlawful referrals (or any other form of false claim). In Response, Relators rest entirely on their allegation that the Agreements were "shams" because, according to Relators, "*Baptist did not recruit them to Beaumont at all* and the remuneration at issue only benefitted Baptist and its major referral source, SETMA." (Resp. at 1) (emphasis added). But those claims fail as a matter of fact and law.

*First*, and as the Complaint concedes, joint physician recruitment agreements are *lawful* and entail a hospital and practice jointly sharing in the costs, burdens, and benefits of recruitment. (Compl. ¶ 71.) That is precisely what the Complaint and the Agreements themselves make clear happened here. Bringing Relators to Beaumont entailed costs – their salaries, for example, and the relocation bonus they demanded – so SETMA and Baptist agreed to share in the costs of doing so, that is of recruiting them. (*Id.* ¶ 106, 118–19.) In return, SETMA received the benefit of Relators' services *at SETMA* while Baptist received benefit of additional doctors to cover shifts and serve on call *at Baptist*. (*Compare* Ex. 1, Addendum § 1, *with id.* Physician Recruitment and Loan Agreement, § 4.4.) That SETMA led communications with Relators about their recruitment to Beaumont is immaterial; Relators still – in nearly two years of briefing on this motion to dismiss – cite no authority or requirement that when a practice group and hospital jointly share in the costs of recruiting a physician to an underserved community that they both reach out to the physician at

the same time, or that they play any particular role in identifying the physician, negotiating with the physician, or participating in the recruitment. That is because there is none.

Instead, Relators contend in conclusory fashion that "Baptist did not recruit them." (Resp. at 1.) But the Complaint lists the myriad ways that Baptist's financial contributions were *central* to Relators' recruitment, including covering the costs of signing bonuses that were – as they allege – critical to their ability to relocate. (Compl. ¶¶ 100, 102.) Moreover, while Relators claim to have been unaware, prior to June 2015, that Baptist and SETMA would be working together to cover the costs of their Recruitment, the Complaint itself acknowledges that (i) Dr. Minsloff was told by SETMA in January 2015 that she would need to be "on staff" at Baptist, and (ii) that Baptist and SETMA were likely coordinating on Relators' recruitment well before Relators claim to have learned of Baptist's involvement. (*Id.* ¶ 111–13.)

Relators' further assertion that "the remuneration at issue only benefitted Baptist and its major referral source, SETMA" (Resp. at 1) draws equally little support from the Agreements themselves and the Complaint's factual allegations. On the contrary, those documents make clear that Baptist's financial contributions went to *Relators* and that Baptist and SETMA would share the costs of compensating Relators for relocating to Beaumont. Indeed, as the Agreements document, payments made by Baptist nominally to SETMA under the terms of the Agreement were to be "pass[ed] directly through" to the Relators.[1] That, of course, is why when Relators breached the Agreements, Baptist had to pursue litigation against Relators (not SETMA) to recoup monies owed, which Baptist did successfully. The Agreements also make clear that payments

---

[1] *E.g.*, Ex. 1, Addendum § 5(b) ("[SETMA] shall ensure that . . . all remuneration from [Baptist] paid pursuant to the Agreement to [SETMA] shall pass directly through to or remain with the recruited Physician."); *id*., Addendum § 3 ("Physician has elected to authorized [Baptist] to pay Subsidy Payments due to Physician . . . directly to [SETMA]. [SETMA] understands its obligation under federal law to ensure that all such Subsidy Payments pass directly through to Physician.").

made by Baptist secured important benefits *for Baptist*, including securing Relators' presence in the community for (what was supposed to be) a four-year period, and ensuring their commitment to be on call at the Hospital during that time period. (Ex. 1, Physician Recruitment and Loan Agreement, § 4.3–4.4.)

Presumably aware of the weakness of their factual allegations, Relators instead ask the Court to defer judgment because, as they contend, the "Stark Law exceptions or Anti-Kickback Statute safe harbors," which set forth certain guidelines for physician recruitment agreements, "constitute affirmative defenses." (Resp. at 11.) But while application of the safe harbors might be affirmative defenses *if invoked* as such, Baptist has not asked the Court (yet) to find that the safe harbors apply (as they do). At this stage, because recruitment agreements are not *per se* improper, it is Relators' burden to plausibly allege why these agreements constitute *unlawful* conduct as a predicate to a claim to relief. *See Twombly*, 550 U.S. at 555–57 (where challenged agreement was not inherently unlawful, "a conclusory allegation" to the contrary "does not supply facts adequate to show illegality"). And Relators have not met that burden here.[2] Notably, the cases Relators rely on only underscore the deficiency of their allegations, because each of those cases involved allegations of facially *unlawful* behavior above and beyond the mere existence of a recruitment agreement.[3] *See, e.g.*, *U.S. ex rel. Jacobs v. CDS, P.A.*, 2015 WL 5698395, at *6 (D. Idaho Sept.

---

[2] Relators' sole attempts to address the AKS Safe Harbor and the Stark Law Exception – i.e., allegations that the agreements "do[] not enjoy the protection of any safe harbor" and "d[o] not satisfy the elements required to meet th[e] Stark Law exception" (Compl. ¶¶ 70, 78) – are the sorts of conclusory legal assertions the court need *not* accept as true or give weight to, particularly given that they are supported by no specific or supportive factual allegations.

[3] Relators overstate their reliance on *Hagen* to argue that the Complaint satisfies Rule 9(b)'s pleading standards simply by referencing – without more – a recruitment agreement that could potentially violate the AKS and Stark. (Resp. at 11.) The *Hagen* court ruled on a constitutional challenge to the AKS. *United States v. Hagen*, 2020 WL 1929848, at *10 (N.D. Tex. Apr. 21, 2020). The defendants in that matter were not arguing that the government failed to meet its pleading burden, but rather that the AKS did not "specify that marketing arrangements such as the Hagens' can subject them to criminal liability" and was therefore unconstitutionally vague. *Id*. The court denied that challenge, reasoning that the AKS need not precisely prohibit the exact marketing arrangement at issue in order to be constitutional. *Id*. Indeed, the indictment at issue in *Hagen* pleaded examples of conduct and communications that plausibly called into question the legitimacy of what otherwise could have been a lawful marketing agreement. *See id*. at *7.

28, 2015) (allegations that hospital under guise of recruitment agreement, intentionally paid the practice amounts in *excess* of *the actual costs* attributable to the recruitment plausibly allege unlawful kickback at motion to dismiss stage); *see also Polk Cnty., Tex. v. Peters*, 800 F. Supp. 1451, 1456 (E.D. Tex. 1992) (finding recruitment agreement unlawful where it was undisputed that a hospital knowingly made remuneration to physicians *subject to defendant's referral of patients to the hospital*).

*Second*, even assuming the Complaint could be read to allege the Agreements were "shams," Relators do nothing to allege the unlawful referrals central to their asserted "payments-for-referrals scheme." Indeed, nearly ten years after the events underlying this litigation, armed with discovery from both the prior litigation and this one, Relators nonetheless fail to allege that anyone at Baptist *ever* raised with them the prospect of a referral or asked for a referral; that any other doctor at SETMA referred a Medicare or Medicaid patient to Baptist as a result of the Recruitment Agreements; or that anyone ever suggested, directly or indirectly, any link between the Recruitment Agreements and any referral. Tellingly, they do not allege that they referred patients to Baptist as a result of the Recruitment Agreements.[4]

Unable to cure those defects, Relators attempt to rely on the fact that Baptist – like virtually every hospital in America – participates in Medicare and Medicaid.[5] That unremarkable fact does

---

[4] Relators suggest that a violation of that AKS only requires allegations of "a kickback with the intent to induce a referral, whether or not a particular referral results." (Resp. at 13, n.5 (quoting *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 650 (N.D. Tex. 2020)).) Leaving aside the fact that Relators have failed to allege that any payment was made by Baptist with the "intent to induce a referral," *Medoc* involved a criminal claim brought pursuant to the AKS. Here, Relators claims are brought pursuant to the FCA, which does require the submission of a claim for payment to the Government stemming from an unlawful referral. *See, e.g.*, *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 674–75 (S.D. Tex. 2013) (finding "Relators do not plead either specific examples of illegal referrals or reliable indicia creating an inference that such referrals occurred, as required by *Grubbs*").

[5] Relators argue that the Agreements "require Relators to *repay* Baptist if Medicare or Medicaid reduced Baptists' payments on Relators' patient referrals." (Resp. at 18.) That is a distortion of § 7.2 of the Agreements which states that "[i]f Physician fails to provide necessary information . . . in regard to compliance with the record keeping and access requirements of Medicare, Medicaid, or other third-party reimbursement programs, and [Baptist's] reimbursement is diminished thereby, then Physician shall repay [Baptist] all such losses resulting." Ex. 1, § 7.2; Ex. 2, § 7.2. Relatedly, § 4.5 simply requires Relators to "accept as patients" Medicare and Medicaid beneficiaries and

5

nothing to establish the existence of a scheme to make unlawful referrals. Alternatively, Relators point to a single email – sent internally by physicians at SETMA – in February 2017, or shortly after Relators had already announced their intention to depart Beaumont, in which a SETMA doctor asked "Why are there so many admits in St. E's? This is not good for our relationship with [B]aptist[.]" (Compl. ¶ 122) (emphasis omitted). As an initial matter, if anything this email supports the inference that SETMA doctors were *not* somehow favoring Baptist Hospital – and as a result SETMA patients were being admitted at a higher rate at "St. E's," another area hospital – which is completely *inconsistent* with Relators' theory.

But further, as explained in Baptist's opening brief, even drawing every inference in Relators' favor, there is nothing about that alleged communication that demonstrates the existence of an unlawful scheme. Indeed, the communication does not (i) mention referrals, or (ii) tie the "census" at Baptist "or St. E's" to the Agreements. That SETMA patients were also admitted at Baptist (or St. E's) is unremarkable – there are only two major hospitals in Beaumont – and also insufficient. What the FCA requires are alleged facts *linking* the Agreements to referrals or a scheme to make referrals, i.e. "facts *linking* the alleged kickbacks to the submission of a false claim." *U.S. ex rel. Sparks v. IntegraCare Home Health Servs., Inc.*, 2017 WL 11711732, at *11 (E.D. Tex. July 6, 2017) (emphasis added) (applying *Grubbs* and dismissing FCA claim); *see also U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (affirming grant of motion to dismiss because "[relator]'s complaint does not identify a single claim submitted by [the hospital] for services rendered pursuant to an illegal referral"). This Relators cannot do.

---

"comply with all laws and regulations" necessary to do so. Ex. 1, § 4.5; Ex. 2, § 4.5. It bears repeating that the simple fact that Baptist accepts Medicare and Medicaid patients – like nearly every hospital in America– is not evidence of an intent to induce referrals. These sections are wholly devoid of any obligation to make patient referrals of any kind, let alone referrals of federal health care program beneficiaries.

Once again, the cases Relators cite underscore the insufficiency of Relators' allegations. For example, in *U.S. ex rel. Woodard v. DaVita, Inc.*, 2011 WL 13196556 (E.D. Tex. May 9, 2011), the court found that the relators in that action had met the *Grubbs* standard because they had "plead[ed] the fraudulent scheme with particularity *and provide[d] representative examples of specific fraudulent acts conducted pursuant to that scheme.*" *Id.* at *5 (emphasis added); *see also U.S. ex rel. Campbell v. KIC Dev., LLC*, 2019 WL 6884485, at *14 (W.D. Tex. Dec. 10, 2019) (finding that complaint satisfied *Grubbs* where it provided details *of specific conversations* with scheme participants about the alleged unlawful conspiracy). Relators have not done so here.

## II.     The Complaint Fails to Allege Scienter as to Baptist.

There is a second, independent reason for dismissal: the Complaint wholly fails to allege that anyone at Baptist acted with scienter, that is with "'guilty knowledge of a purpose on the part of [defendant] to cheat the Government' or 'knowledge or guilty intent.'" *Taylor-Vick*, 513 F.3d at 231 (citations omitted). Indeed, as detailed more fully in Baptist's Motion, the Complaint is almost entirely devoid of allegations as to Baptist employees *at all*, and as their Response makes clear, Relators concerns pertained to the conduct of *SETMA*, not Baptist. (*E.g.*, Resp. at 3).

In their Response,[6] Relators focus on Baptist's Director of Physician Recruitment, Michelle Wiltz – the only Baptist employee named in the Complaint – but neither the allegations in the Complaint, nor Relators' efforts to recharacterize them in their instant brief, come anywhere near meeting their burden. Relators contend that Ms. Wiltz "pushed the sham agreements on Relators even though Ms. Wiltz knew that Baptist played no role in Relators' recruitment." (Resp. at 23.) As an initial matter, Ms. Wiltz is not alleged to have had anything to do with patients, referrals,

---

[6] Relators purport to list seven different categories of allegations ostensibly relevant to "scienter" (Resp. at 3–4), most of do not concern Baptist and none of which identify a specific Baptist employee. In particular, items (1)-(4) all relate exclusively to the alleged conduct of SETMA, not Baptist. And items (5)-(7) – as discussed above – pertain to the alleged conduct of Ms. Wiltz and the plain language of the Agreements, which Relators liberally mischaracterize.

7

the generation or submission of claims, or any certifications of compliance submitted therewith by Baptist. Her role, as alleged in the Complaint, is limited to executing paperwork in connection with the Agreements. As such, Relators' allegations, even if credited, would be insufficient.

But there is a more fundamental problem with Relators' claims as to Ms. Wiltz: despite their extraordinary reliance on timing, Relators do not ever allege that she or anyone at Baptist was *aware* – as of July 2015 – that Relators had already signed employment agreements with SETMA or, as Relators would have it, that Relators "did not need to be recruited." (Resp. at 7.) Nor do Relators allege that Ms. Wiltz or anyone at Baptist was aware that Relators had moved or that they were receiving mail at a new address at any point before she sent letter, on June 30, 2015, to Relators' old address, in Lubbock, Texas. And, to the contrary, the Complaint alleges that Relators, did not actually close on their new home in Beaumont until "early July 2015," did not move in until some unspecified point after, and were not scheduled to be at SETMA until August. (Compl. ¶ 104.) As such, Relators' factual allegations do not support their core theory as to Ms. Wiltz.[7]

In a desperate attempt to fabricate scienter where there is none Relators assert in their brief that an LOI that Ms. Wiltz sent to Relators on July 15, 2021 was "back-dated" to June 30, 2021. (*E.g.*, Resp. at 7, 14.) No such allegation appears in the Complaint. *Cf. Diamond Beach Owners Ass'n v. Stuart Dean Co.,* 2018 WL 7291722, at *2 n.2 (S.D. Tex. Dec. 21, 2018), *report and recommendation adopted*, 2019 WL 245462 (S.D. Tex. Jan. 17, 2019) ("A party may not rely on new facts asserted for the first time in a response to a motion to dismiss to defeat the underlying motion."). More important, the new claim makes no sense: under Relators' theory, there would

---

[7] Notably, Relators certainly do not allege to have informed Ms. Wiltz of as much or to have raised any concerns about these "sham" agreements prior to signing them. More generally, far from "pretend[ing]" to recruit Relators, the Complaint alleges multiple legitimate steps Ms. Wiltz took in furtherance of the recruitment, including: (i) communicating with Relators about their recruitment; (ii) transmitting an LOI reflecting the terms of the recruitment; (iii) and transmitting the Recruitment Agreements. (Compl. ¶¶ 105–07.)

be no distinction between an LOI dated in late June as opposed to early July 2015, since, as they would have it, they had allegedly agreed to join SETMA much earlier in the year. Indeed, under Relators' theory, if Ms. Wiltz had in fact wanted to "back-date[]" the LOI to somehow conceal the timing concerns raised in the Complaint, she would have needed to include a date in early *January* 2015 (or earlier). She of course did not.

Relators alternatively contend they have adequately alleged scienter as to David Parmer, Baptist's former CEO. But Mr. Parmer's name appears nowhere in the Complaint – there is not a *single* allegation as to his involvement or knowledge – and the unremarkable fact that he signed the Agreements in his capacity as CEO of Baptist is nowhere near sufficient to plausibly allege he acted with "guilty knowledge" or an intent to defraud the government. *Cf. U.S. ex rel. Frey v. Health Mgmt. Sys., Inc.*, 2023 WL 2563239, at *8 (S.D. Tex. Feb. 10, 2023) (identifying CEO as person with motivation to participate in alleged scheme did not sufficiently "allege that [the CEO] was aware of or participated in the [scheme] alleged in the amended complaint").

Finally, Relators' allegations that Baptist was aware of the prohibitions imposed by the AKS and Stark Law does nothing to meet their burden. (Resp. at 20–21.) On the contrary, if anything, Baptist's understanding of the applicable legal framework as reflected in multiple provisions of the written Recruitment Agreements further underscores the baselessness and insufficiency of Relators' attempts to label, in conclusory fashion, the same as "shams."

**IV.    Relators' TMFPA Claims Should Be Dismissed.**

The Court should also dismiss the TMFPA claims against Baptist because the state law claims are based on the same deficient alleged facts and theories as the FCA claims that should also be dismissed. While it is true, that the elements of the TMFPA are not identical to the elements under the FCA, Relators concede that "the Texas claims are based on the same alleged facts and

9

similar legal theories." (Resp. at 27.) Therefore, the core elements are sufficiently close that as in most cases where the allegations "depend on the same operative facts and legal requirements," the court may properly dismiss both the FCA and TMFPA claims. *U.S. ex rel. Williams v. McKesson Corp.*, 2014 WL 3353247, at *4–5 (N.D. Tex. July 9, 2014).

That is certainly true here: for example, there is no question the claims under the TMFPA still "must satisfy the Rule 9(b) pleading requirement," *United States v. Dental Health Programs, Inc.*, 2020 WL 3064712, at *7 (N.D. Tex. June 8, 2020) (quoting Tex. Hum. Res. Code Ann. §§ 36.002(1), (2)). For substantially the reasons set forth above, Relators have failed to meet those requirements. Similarly, while the TMFPA provisions prohibit the payment or receipt of kickbacks in exchange for referring patients for the furnishing of services, *see* Tex. Hum. Res. Code Ann. §§ 36.002(5), (13), as argued above, Relators do not plausibly allege such a payment-for-referrals scheme. *See Mendez v. Drs. Hosp. at Renaissance, Ltd.*, 2022 WL 2990913, at *6–7 (S.D. Tex. July 27, 2022) (*Mendez I*) (dismissing TMPFA claims under §§ 36.002(5), (13) based on the same illegal remuneration theory as FCA claims that were dismissed).

**V.     Dismissal Should Be With Prejudice.**

Finally, dismissal should be with prejudice. In the *two years* since Baptist filed its original motion, Relators have had every opportunity to amend if they did, in fact, have new factual allegations. They have not done so. At bare minimum, the Court should require Relators to proffer the "further allegations supporting their claims against Baptist" (Resp. at 29) they claim to be able to supply before permitting them to further burden the Court with another Complaint that will warrant dismissal.

**CONCLUSION**

For the foregoing reasons, all claims as to Baptist should be dismissed with prejudice.

10

Dated: June 2, 2025                              Respectfully submitted,

*/s/ J. Thad. Heartfield*
M. Dru Montgomery
J. Thad Heartfield
State Bar No. 09346800
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, TX 77706
Telephone: 409-866-3318
Facsimile: 409-866-5789
dru@heartfieldlawfirm.com
thad@heartfieldlawfirm.com

Edward B. Diskant
M. Elias Berman
MCDERMOTT WILL & EMERY LLP
1 Vanderbilt Avenue
New York, NY  10017
Tel: (212) 547-5400
Fax: (646) 390-0877
ediskant@mwe.com

Jennifer B. Routh
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
Tel: (202) 756-8000
Fax: (202) 756-8087
jrouth@mwe.com

ATTORNEYS FOR DEFENDANT,
Baptist Hospitals of Southeast Texas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on this 2nd day of June, 2025.

/s/ *J. Thad Heartfield*
J. Thad Heartfield